David N. Lake, Esq., State Bar No. 180775
**LAW OFFICES OF DAVID N. LAKE**
 **A Professional Corporation**
16130 Ventura Boulevard, Suite 650
Encino, California 91436
Telephone: (818) 788-5100
Facsimile: (818) 479-9990
david@lakelawpc.com

*Attorney for Plaintiff Samantha Smith*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| SAMANTHA SMITH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SNOWFLAKE, INC., FRANK SLOOTMAN, AND MICHAEL P. SCARPELLI,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION** |

## **INTRODUCTION**

1.      Plaintiff Samantha Smith, by and through her undersigned counsel, respectfully submits this Class Action Complaint ("Complaint") alleging claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants Snowflake, Inc., and its two former top executives, Frank Slootman and Michael P. Scarpelli. Plaintiff brings these claims on behalf of herself and all persons and entities other than Defendants who purchased or otherwise acquired Snowflake, Inc. ("Snowflake", "SNOW", or the "Company") stock between May 24, 2023 and June 10, 2024, both dates inclusive (the "Class Period").  This group is referred to as the "Class."  Plaintiff alleges the following based upon information and belief, except as to those allegations concerning Plaintiff which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes a review and analysis of: (1) Snowflake's regulatory filings with the SEC; (2) press releases and media reports issued and disseminated by the Company; (3) analyst and media reports concerning the Company; and (4) other public information regarding the Company, including statements made by Snowflake executives. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## **OVERVIEW**

2.      This matter involves Snowflake, a public company which enables large and small enterprises to store and analyze data it maintains for them "in the cloud."  After its public debut in 2020, the Company exhibited rapid growth.  It even projected $10 billion in revenues by 2029.   By mid-2023, however, Snowflake's growth rate was threatened by numerous factors.  Instead of just admitting the truth, Snowflake's top executives took a business as usual approach during conference calls and other presentations, while CEO Slootman secretly planned his retirement and adjusted his stock sale plan such that he quickly sold off $223

1

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

million worth of stock in just 46 days on the eve of Snowflake releasing bad news which cratered the stock price. During the Class Period, it was anything but "business as usual" at Snowflake. Rather, the Company was hard-pressed to battle customer demands for discounts, new competitive technologies, and the effects on usage of its products resulting from its own software improvements. On top of all this, toward the end of the Class Period, the Defendants' scheme to conceal the lack of customer data security fell apart, as key customers were hit by a massive data breach, further dropping the stock price. In light of these events, Plaintiff, who was harmed by this misconduct, seeks damages for securities fraud on behalf of herself and specified Class members.

## SUMMARY OF THE ALLEGATIONS

3.　　Snowflake is a leading software-as-a-service ("SaaS") provider, specializing in cloud data storage. A customer who generates large amounts of data can use its own computing and storage facilities or can upload their data to a large data bank manager like Snowflake. Many large and small companies find it difficult, expensive, and cumbersome to create their own data storage facilities, as this is not their core business and requires sophisticated expertise and considerable expense. For this reason, Snowflake has been able to sign up thousands of data storage customers. Larger customers are often referred to as "enterprises", and the product they seek must be able to scale rapidly to hold more and different types of data. Such "enterprise storage" is essential, but can be costly.

4.　　Snowflake's founders included numerous experienced software executives, chief among them defendant Frank Slootman ("Slootman"). Slootman was Snowflake's Chairman and CEO from 2019 to early 2024. Prior to his involvement with Snowflake, Slootman was CEO and President of ServiceNow, a company specializing in helping businesses reduce their reliance on email and spreadsheets by "automating" many daily tasks. At ServiceNow, Slootman demonstrated expertise at scaling a SaaS company. ServiceNow grew during his tenure (2011 to 2017) from around $100M in revenue, to $1.4B, and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

successfully completed an IPO.  Slootman worked closely with defendant Michael P. Scarpelli ("Scarpelli"), ServiceNow's CFO (and rightly considered a Snowflake co-founder), to replicate this success at Snowflake.

5.    Under the leadership of Slootman and Scarpelli (installed in 2019 as Snowflake's CFO), Snowflake grew rapidly and completed an IPO in September 2020.  At that time, it had more than 3,000 customers.

6.    Central to Snowflake's business model is "consumption-based" pricing. Snowflake has described this model as follows: "The consumption model of pricing, also known as usage-based pricing or consumption-based pricing, operates on a pay-as-you-go approach. Unlike subscription-based pricing, which charges customers a set rate for a certain number of licenses or seats, usage-based pricing charges customers only for the resources they actually consume."  Customers have traditionally been given the option of buying "credits" in advance and then using them as needs arise.  Some large customers also have been able to obtain discounts, known as "tiered pricing."  Over time, such discounting grew to include more than just large customers.  Customers could also incur additional charges for using services beyond basic storage and "queries" ("queries" are interactive uses of the database which are needed to use or analyze data).

7.    While this pricing model has its benefits, some customers have found consumption-based pricing difficult to manage.  Their concerns largely revolve around budgeting, foreseeability, and the lack of expertise needed to manage (and therefore reduce) consumption.  To Snowflake's dismay, many customers during the Class Period sought to reduce reliance on Snowflake, including by using an "open source" data storage service known as "Iceberg Tables."  Beginning in 2022, Iceberg Tables presented a severe threat to Snowflake, as it enabled users to create their own storage systems more easily and economically.  Snowflake attempted to counter this threat by formulating its own Iceberg-

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

based technology, including a product known as Snowflake Managed Iceberg Tables. But Iceberg-based technologies created by other companies remained a growing threat.

8.    In light of this revolution in storage methods, customers sought discounts. Still others benefited from Snowflake's own innovative efficiency which had the effect of tempering Snowflake's ability to grow margins and profits. Defendants failed to address these issues when discussing the Company's business and prospects.

9.    Still more trouble was lurking. The electronic storage industry was shaken by a series of data breaches in 2023, that were now occurring in record-setting numbers. The 3,205 data breaches in 2023 represented a 78% increase over the number in 2022. Defendants knew that a major data breach affecting Snowflake would be harmful to the Company and its stockholders. They also knew that a major deterrent to a breach was the "multi-factor authentication" or "MFA" system (this is a system whereby a person signing on to a system enters a password plus does one or more other things to prove identity, such as entering a code received via text message). However, Snowflake's system architecture set up roadblocks: MFA was turned off by default, and systems administrators could not impose the safety measure (in industry terms could not "enforce" it). In discussing Snowflake's risks and systems, Snowflake and the individual Defendants created a misimpression that customers were handling security, when in fact they had not been able to do so. In late May and early June 2024, Snowflake's data security issues were revealed, as a major data breach hit many of Snowflake's most prominent customers, which negatively affected Snowflake's stock. Snowflake scrambled to address the problem and refine its architecture. (In the ensuing multidistrict federal litigation, Snowflake's arguments that it lacked a duty to protect customers against this breach were rejected).

10.    All of these factors placed pressure on Snowflake. Nonetheless, during the Class Period, the Defendants failed to frankly acknowledge the seriousness of these issues, and deceived investors by downplaying them. Defendant Slootman had a very personal motive to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

do so.  During the Class Period, Slootman created a Rule 10b5-1 sales plan, which triggered stock sales when prices hit certain parameters.  From publicly reported trading, it can be inferred that Slootman's plan was designed to sell a tsunami of shares once Snowflake reached very high prices.  Thus, after tepid personal stock sales in early 2023, Slootman sold approximately $223 million worth of Snowflake stock in only 46 days, right before the Company disclosed devastating news about various business challenges, beginning with a conference call which shocked the market on February 28, 2024 (the very day Slootman announced his retirement).   Slootman's late 2023 to early 2024 sales history under his Rule 10b5-1 plan, adopted September 25, 2023, was as follows:

| Transaction Date | Reported DateTime ▼ | Company | Symbol | Insider Relationship | Shares Traded | Average Price | Total Amount | Shares Owned | Filing |
|---|---|---|---|---|---|---|---|---|---|
| 2024-02-09 Sale | 2024-02-12 5:25 pm | Snowflake Inc. | SNOW | Slootman Frank CEO and Chairman | 213,922 | $232.67 | $49,774,044 | 11,642,113 (Indirect Direct) | View |
| 2024-02-08 Sale | 2024-02-09 4:47 pm | Snowflake Inc. | SNOW | Slootman Frank CEO and Chairman | 86,078 | $225.13 | $19,378,740 | 11,856,035 (Indirect Direct) | View |
| 2023-12-28 Sale | 2024-01-02 4:40 pm | Snowflake Inc. | SNOW | Slootman Frank CEO and Chairman | 275,000 | $200.78 | $55,215,839 | 11,942,113 (Indirect Direct) | View |
| 2023-12-26 Sale | 2023-12-28 4:31 pm | Snowflake Inc. | SNOW | Slootman Frank CEO and Chairman | 500,000 | $197.29 | $98,645,995 | 23,637,477 (Indirect Direct) | View |

11.     After having vehemently denied a Business Insider report on June 2023 that he was considering retirement, on February 28, 2024, as noted above, CEO Slootman made a "surprise" announcement that he was retiring, effective immediately.

12.     Also on February 28, 2024, the adverse developments referenced above were partly revealed.  CFO Scarpelli stated on an earnings call that day: "We are forecasting increased revenue headwinds associated with product efficiency gains, tiered storage pricing and the expectation that some of our customers will leverage Iceberg Tables for their storage."  He added: "we do expect a number of our large customers are going to adopt Iceberg formats and move their data out of Snowflake where we lose that storage revenue and also the compute revenue associated with moving that data into Snowflake."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

As to tiered pricing, Scarpelli noted: "we rolled out in Q4 tiered storage pricing. So, the amount of revenue associated with storage is coming down." The forecast going forward was: a non-GAAP product gross margin of 76%, a non-GAAP operating margin of 6%, and non-GAAP adjusted free cash flow margin of 29%.

13. In reaction, the stock price dropped $41.72 (18.14%,) from a close of $230.00 per share on February 28, 2024 to $188.28 per share on February 29, 2024. Trading volume was 42.3 million shares, a sharp increase from ordinary daily numbers.

14. After these results and projections, the stock price drifted downward and was trading at $163.34 on May 22, 2024.

15. A conference call held that afternoon subsequent to the close of the market delivered more bad news, showing that the prior forecasts were unreasonably optimistic, and ignored increased spending needed to accelerate Snowflake's initiatives in the field of artificial intelligence (AI). CFO Scarpelli admitted: "We are lowering our full year margin guidance in light of increased GPU-related costs related to our AI initiatives." A GPU, or Graphics Processing Unit, is a piece of hardware which can perform vast numbers of calculations rapidly. It has become essential to AI development. Defendant Scarpelli knew or recklessly disregarded that the forecasted spend for this was previously understated. If the projections had reflected this at the time of the February 2024 conference call, the February drop would have been even more profound.

16. As to annual forecasts, these were lowered as well. Scarpelli said: "For FY '25, we expect 75% non-GAAP product gross margin, 3% non-GAAP operating margin and 26% non-GAAP adjusted free cash flow margin." This compares with previously forecasted numbers of 76%, 6% and 29%, respectively.

17. On May 23, 2024, Snowflake stock dropped in reaction to this news on higher than normal trading volume, from $163.34 to 156.16.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

18.     In addition, at this same time, a data breach affecting major Snowflake customers was beginning to become known.  As news regarding the extent and causes of the breach came out bit-by-bit, Snowflake's shares dropped.

19.     On May 22, 2024, cybersecurity watchdog Mandiant notified Snowflake and law enforcement of an ongoing hacker campaign focusing on Snowflake customers.  On May 30, 2024 Snowflake reported: "We became aware of potentially unauthorized access to certain customer accounts on May 23, 2024."  In the following days, several major customers confirmed they had been hacked.  Finally, on June 10, 2024, Mandiant reported that as many as 165 companies had been affected, including household names such as Ticketmaster, AT&T, Santander Group, Advance Auto Parts, Lending Tree and Neiman Marcus.

20.     By June 10, 2024, Snowflake stock had fallen to $126.76 on high trading volume, with breach-related disclosures largely responsible for driving the price down as revelations jolted the market little by little, eroding the stock price from its initial value of $154.58 on May 23, 2024.   These price drops represented the materialization of an undisclosed risk that flowed from Snowflake's concealment of the degree of vulnerability and lack of precautions prevailing at major Snowflake customers. During the Class Period, instead of frankly disclosing customers' unpreparedness when it raised the issue of customer security, Snowflake misleadingly downplayed the matter by simply stating the customer was (in its view) solely responsible for access security.  Snowflake did not reveal that major customers were unable to handle that responsibility, or that Snowflake's systems actually impeded the adoption by customers of certain key security measures.  Indeed, security practices such as those revealed to have been adopted by Snowflake had previously been characterized by CISA (the Cybersecurity & Infrastructure Security Agency) in its 2023 white paper as "untenable" and "vulnerable by design."   The Defendants thus concealed the nature and magnitude of this known risk, and their security-related

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

statements were misleading "half truths." Snowflake has since conceded that, as to security issues, the company and its customers have a "shared destiny." Moreover, on an August 2024 conference call CEO Ramswamy finally admitted: *"we understand that when it comes to cybersecurity, we are all in it together."* Snowflake has also worked to drastically upgrade customer security tools.

21. For the reasons stated above, Snowflake stock was artificially inflated during the Class Period, and stockholders were damaged when the truth was revealed.

## JURISDICTION AND VENUE

22. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

23. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

24. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 27 U.S.C. § 1391(b) and (c). At all relevant times, Snowflake conducted substantial business in this District and many of the acts and practices complained of herein occurred in substantial part in this District. Snowflake maintains its corporate offices in Menlo Park, California.

25. In connection with the material misrepresentations of facts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of national securities exchanges.

## THE PARTIES

26. Plaintiff Samantha Smith ("Plaintiff") purchased Snowflake common stock on March 28, 2024 as detailed in the attached Certification and was damaged thereby.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

27. Defendant Snowflake was founded in San Mateo, California, where it maintained its corporate headquarters until May 2021, when it announced its status as "a globally distributed workforce and no corporate headquarters." Snowflake is incorporated in Delaware and its principal executive offices are presently located and listed on SEC filings as at 135 Constitution Drive, Menlo Park, CA 94025. The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "SNOW."

28. Defendant Slootman served as the Company's Chief Executive Officer from April 26, 2019 until February 27, 2024. Slootman has also served as the Chairman of Snowflake's Board of Directors from December 2019 until the present.

29. Defendant Scarpelli served as the Company's Chief Financial Officer ("CFO") from April 29, 2019 until February 25, 2025, when he announced his retirement.

30. Defendants Slootman and Scarpelli are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Snowflake's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made to investors regarding consumption and revenues were then materially false and/or misleading.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

31. Snowflake and the Individual Defendants are referred to collectively as "Defendants".

32. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential, proprietary information concerning the Company and its business, operations, services, competitive challenges, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

33. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

34. Snowflake was founded to address a growing need for high quality data storage. Many different types of companies require this, and they need the software to be flexible, scalable and cost-effective. In many cases, they cannot handle the task themselves

10

(or they cannot do so entirely). Finally, due to an active hacker "community", customers of such companies expect certain levels of security such that their data is not "breached."

### A. Competitive Pressures and New Technology

35. In connection with its 2020 IPO, Snowflake stated in its Form S-1: "We deliver our platform through a customer-centric, consumption-based business model, only charging customers for the resources they use." This billing methodology was represented to reflect a trend: "We believe that business models are evolving from a fixed capacity, where customers often pay for unused software, to a utility model, where customers pay only for the resources they consume." Nonetheless, there were risks: "There is a risk that customers will consume our platform more slowly than we expect, and our actual results may differ from our forecasts. Further, investors and securities analysts may not understand how our consumption-based business model differs from a subscription-based business model, and our business model may be compared to subscription-based business models." This model also creates certain tensions with users. Users want to lower bills, while Snowflake desires increased consumption. This requires heavy investment in an aggressive salesforce: "Once a new customer begins using our platform, our sales team will need to continue to focus on expanding consumption with that customer." In addition, new product features, whether based on AI or other emergent technologies, improve efficiency while sometimes reducing usage.

36. Snowflake concealed some of its most prominent usage, billing model and competitive challenges during the Class Period, thus inflating the stock.

37. For example, on the first quarter fiscal 2024 earnings call held on May 24, 2023 (the start of the Class Period), a great deal of discussion was held regarding consumption trends. CFO Scarpelli did not attribute consumption issues to competitive pressures, but rather to difficulties customers were facing in their own businesses. He stated, "A few of our largest customers have scrutinized Snowflake costs, as they face

11

headwinds in their own businesses." CEO Slootman echoed this sentiment: "While enthusiasm for Snowflake is high, enterprises are preoccupied with cost in response to their own uncertainties."

38. These statements were misleading. Snowflake was facing challenges, but this could not be laid at the doorstep of the customers or their particular business issues. Rather, Snowflake was being adversely affected by increasing competition, including from open source technologies like Iceberg. In addition, there was increasing pushback against the consumption model itself. Organizations often lacked the sophistication to "optimize" usage and queries, leading to huge bills. Optimizing Snowflake costs requires specialized skills, as users must manage storage, data transfer, and serverless costs separately. Many could not do this, leading to cost overruns and budgeting issues. Thus, the pushback was not wholly due to general businesses problems—rather, the customers had "Snowflake problems." Snowflake, too, was the source of some of the downward consumption trends they were seeing. It was improving the efficiency of its technology to remain competitive. These issues will be collectively referred to herein as "Consumption Pushback, New Efficiencies and Competitive Pressures." Aggravating these issues was Snowflake's need to aggressively compensate its growing salesforce, and customer demands for discounts.

39. In terms of specific competitive pressures, the emergence of Iceberg cannot be understated. Iceberg was originally developed by Netflix. In 2018, Netflix donated Iceberg to the Apache Software Foundation, making it an open-source project. This meant that the product, sometimes referred to as Apache Iceberg, could be used by any company, and these users were free to refine it, modify it, and improve it. Snowflake created its own Iceberg-centered versions and various Iceberg applications, but these needed to compete with sometimes cheaper or more efficient Iceberg-based applications. One article, on January 5, 2023, quoted tech forecaster Haoyuan Li as predicting that formats such as Iceberg would, in 2023, be "rapidly adopted." This turned out to be an accurate assessment.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

40.     Some perceived CEO Slootman as being not up to the challenge of these new technologies, which not only included Iceberg, but also AI applications.  Slootman's confidence and active engagement in the business was highly material to investors.  In mid-2023 rumors surfaced that Slootman would soon retire.  On June 26, 2023 *Business Insider* published an article regarding this matter, wherein it reported:

> Snowflake CEO Frank Slootman tells Insider that ongoing rumors that he could soon step down are completely untrue. Insider heard rumors of Slootman's departure from multiple industry sources, and reached out to ask Slootman if he was leaving soon.  "You are wrong on all counts. You are regurgitating competitive FUD," Slootman told us in his famously direct, no-nonsense style. FUD, or fear-uncertainty-doubt, is a favorite old-school tech acronym.

41.     In actuality, Slootman was contemplating retirement, and the Board was about this time or shortly thereafter engaged in a CEO search, with heavy focus on Sridhar Ramaswamy, Snowflake's Senior Vice President of AI and a former Google executive. Ramaswamy joined Snowflake in 2023 via the acquisition of his AI-powered search company, Neeva.  Slootman, upon his retirement a few months later, described Ramaswamy as a needed "hard-driving technologist."

42.     In the meantime, while Snowflake's business issues were being concealed, Slootman established a Rule 10b5-1 sales plan on September 25, 2023 which would supercharge his personal stock sales in the weeks prior to both his surprise retirement and the negative revelations concerning Snowflake's Consumption Pushback, New Efficiencies and Competitive Pressures disclosed in early 2024.  Under his new plan, Slootman sold approximately $223 million worth of Snowflake stock in only 46 days, including a $50 million sale made only 19 days before his retirement announcement.  *See* Para. 10, *supra.*

43.     Another earnings conference call was held on August 23, 2023.  On that call, CEO Slootman barely mentioned Iceberg, and falsely painted it as an unmitigated positive for Snowflake:

13

With our support of Iceberg Tables, we are expanding our data lake scope. Many customers already use Snowflake as a data lake. Large financial services customer consolidates data in Snowflake to eliminate useless extract and transfers of data. This means new use cases are deployed 80% faster. Iceberg Tables will bring additional scope in open file formats to Snowflake. We expect to unlock more data lake opportunities with these capabilities.

44. CFO Scarpelli added on that same call:

…consumption is good. It was really good today as an example. But it's only one data point. We want to see more days of that before we think the -- we're into a real recovery. I think stabilization is the right term. We're not seeing customers reduce their consumption right now.

45. In fact, however, Snowflake was under pressure from Consumption Pushback, New Efficiencies and Competitive Pressures, rendering these statements materially omissive and misleading.

46. On November 29, 2023, during a conference call with investors and analysts after the disclosure of Snowflake's financial results, Defendant Scarpelli stated the following regarding consumption:

In Q3, we saw strong consumption from a broad base of customers. Our performance was evenly split between large and small accounts. Our largest customer stabilized as expected. Migrations drove growth in Q3. Our 2 fastest growing customers who are both migrating workloads from a legacy vendor. One of these accounts is in their second year on the platform, the other in their eighth year on the platform. We added 4 customers with more than $5 million and 2 customers with more than $10 million in trailing 12-month product revenue in the quarter.

47. In fact, however, Snowflake was under pressure from Consumption Pushback, New Efficiencies and Competitive Pressures, rendering these statements materially omissive and misleading.

14

B.    **Consumption Pushback, New Efficiencies and Competitive Pressures Are Revealed**

48.    On February 28, 2024, after the market closed, Snowflake issued a press release and filed a report with the SEC on Form 8-K that disclosed its financial results for the fourth fiscal quarter and full year 2024, provided guidance, and conducted a conference call with investors and analysts. Defendants shocked investors by disclosing that consumption trends and anticipated revenue headwinds associated with product efficiency gains, Iceberg Tables, and tiered storage pricing had impacted their guidance.

49.    On the February 28, 2024 conference call with investors and analysts, Defendant Scarpelli revealed that *"[c]onsumption trends have improved since the ending of last year, but have not returned to pre-FY '24 patterns. We have evolved our forecasting process to be more receptive to recent trends. For that reason, our guidance assumes similar customer behavior to fiscal 2024. We are forecasting increased revenue headwinds associated with product efficiency gains, tiered storage pricing and the expectation that some of our customers will leverage Iceberg Tables for their storage."*

50.    On the same call, Scarpelli further stated that "[t]hese changes in our assumptions impact our long-term guidance" and provided full fiscal year 2025 product revenue guidance of approximately $3.25 billion, representing 22% year-over-year growth.

51.    As a result, Defendants also withdrew their long-standing $10 billion 2029 product revenue target and lowered FY '25 guidance to 22% year-over-year growth, drastically below the market's expectation of 30%: Scarpelli said: "These changes in our assumptions impact our long-term guidance. Internally, we continue to march towards $10 billion in product revenue. Externally, we will not manage expectations to our previous targets until we have more data. We are focused on executing in FY '24 to ensure long-term durable growth."

15

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

52.     On that same day, Defendant Scarpelli further described the expected headwinds and admitted that they had already begun to see the impacts as early as Q4 2024 (which was mainly in the final months of calendar year 2023):

It's about a 6.2%, 6.3% impact this year [from product efficiency gains]. And – but coupled with that, too, in the revenue, *we rolled out in Q4 tiered storage pricing. So the amount of revenue associated with storage is coming down. But on top of that, we do expect a number of our large customers are going to adopt Iceberg formats and move their data out of Snowflake where we lose that storage revenue and also the compute revenue associated with moving that data into Snowflake*. We do expect, though, there'll be more workloads that will move to us, but until we see that incremental revenue on workloads, we're not going to forecast that. I will say, last year, we saw a 62% increase in the number of jobs running on Snowflake year-over-year with a corresponding 33% increase in revenue. And that's because we continue to show our customers that we become cheaper and cheaper to them every year. And when we do that, it opens up new workload opportunities for us, and we'll continue to do that.

53.     Scarpelli further admitted: "A lot of big customers want to have open file formats to give them the options. And by the way, this is not necessarily customers moving all of their storage out of Snowflake, but a lot of the growth in their storage will be put into Iceberg Tables is what we think is going to happen. So you're just not going to see the growth associated with the storage and many of those customers. As a reminder, about 10% to 11% of our overall revenue is associated with storage."

54.     On February 28, 2024, after the market closed, Snowflake also issued a press release and filed a report with the SEC on Form 8-K that disclosed that effective February 27, 2024, Frank Slootman retired as Chief Executive Officer of Snowflake Inc.

55.     On March 5, 2024, Scarpelli admitted at a presentation: "*I do think some of our larger customers, because they've told us they want to, will move to open-file formats in Iceberg. That will take storage out of Snowflake.*"

16

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

56.     Shockingly, CEO Slootman interjected:

Now, on the topic of CEO transition. I was brought to Snowflake five years ago to help the company breakout and scale. I wanted to grow the business fast, but not at all costs. It had to be efficient and establish a foundation for long-term growth. I believe the company succeeded on that mission.

*The Board has run a succession process that wasn't based on arbitrary timeline, but instead, looked for an opportunity to advance the company's mission, well into the future.* The arrival of Sridhar Ramaswamy through the acquisition of Neeva last year represented that opportunity.

Since joining us, Sridhar has been leading Snowflake's AI strategies, bringing new products and features to market at an incredible pace. He led the launch of Snowflake's Cortex, Snowflake's new fully-managed service that makes AI simple and secure. Prior to Neeva, Sridhar lead all of Google's advertising products. During his 15-year tenure at Google, he helped grow AdWords and Google's advertising business from $1.5 billion to over $100 billion.

*With the onslaught of generative AI, Snowflake needs a hard-driving technologist to navigate the challenges the new world represents*. Sridhar's vision for the future and his proven ability to execute at scale made it clear to us as a Board, he is the right executive at the right time to lead Snowflake.

*This marks my retirement from an operating role*. I will remain on duty as Chairman of the Board, and look forward to working with Sridhar and the team going forward.

57.     But this was not the end of the surprising news.  Projections made that day were soon revised, as they had unreasonably and recklessly overlooked necessary expenses related to AI improvements and other costs.

58.     On a May 22, 2024 earnings call, CFO Scarpelli revealed:

For Q2, we expect product revenue between $805 million and $810 million, we are increasing our FY '25 product revenue guidance. We now expect full year product revenue of approximately $3.3 billion, representing 24% year-over-year growth. Turning to margins. *We are lowering our full year margin guidance in light of increased GPU-related costs related to our AI*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*initiatives*. We are operating in a rapidly evolving market, and we view these investments as key to unlocking additional revenue opportunities in the future. As a reminder, we have GPU related costs in both cost of revenue and R&D. We announced our intent to acquire certain technology assets and hire key employees from TruEra. TruEra is an AI observability platform that provides capabilities to evaluate and monitor large language model apps and machine learning models and production. We are excited to welcome approximately 35 employees from TruEra to Snowflake, the impact of the transaction is reflected in our outlook*. For Q2, we expect 3% non-GAAP operating margin. *For FY '25, we expect 75% non-GAAP product gross margin, 3% non-GAAP operating margin and 26% non-GAAP adjusted free cash flow margin.*

59.    Thus, the bad news was spread out between two earnings releases so as to "soften the blow."  In Q1 2025, the sum of S&GA and R&A increased by 31.61%, placing EBIT in negative territory, increasing from -$273 million in 2024 to -$348.5 million in the 2024 first fiscal quarter. Consequently, even on an adjusted basis, SNOW's EPS did not show the improvement that the market had hoped for.   SNOW missed its EPS estimate by more than 19%.  On May 23, 2024, Snowflake stock dropped on higher than normal volume from $163.34 to 156.16.   There was yet more bad news to come.

### C.    Hackers Exploit a Concealed Security Flaw and the Stock Drops Further

60.    Data breaches have affected software companies for many years. Companies like Snowflake can deter the vast majority of data breaches by adopting strong security measures, in partnership with their customers.

61.    Indeed, it seemed in early 2023, that this is what Snowflake was doing.  In its Form 10-K filed on March 29, 2023 at p. 12, Snowflake assured investors that its services promoted strong cybersecurity:

**Cybersecurity.**

Our platform helps eliminate data silos, which can enable robust analytics and better security outcomes. For Cybersecurity, *our platform enables organizations to*:

18

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- Accelerate security analytics. Unify logs, enterprise data, and contextual data sets to achieve better fidelity and automation.
- Leverage customized resources. Access dynamically updated threat intelligence from our Marketplace and a wide network of connected applications that provide out-of-the-box integrations, content, and visualizations to enable initiatives such as threat detection and response.

62.    Snowflake expanded on this topic on its website's blog.   In a September 12, 2023 post entitled, "Understanding Snowflake's Shared Responsibility Model", the Company said as follows:

**What is the Snowflake Shared Responsibility Model?**

It helps establish a clear understanding of who is responsible for which security controls and practices to ensure *a collaborative, yet accountable, approach to security.*

With the Shared Responsibility Model, our users can now have a more comprehensive view of their security obligations *as well as the measures we, at Snowflake, have implemented to protect user data*. This model fosters transparency and empowers our users to actively *participate in* securing their Snowflake deployments. *Our guiding principle is to minimize the customer's obligations under the model and assume a majority of the responsibilities through automation and feature availability within Snowflake's product offering*. This is clear from the size of the customer side of our model compared to other vendors in the market.

63.    This representation was untrue.  In fact, Snowflake devoted minimal energy to protecting customer data, and placed the vast majority of the responsibility onto its customers, who were ill-prepared to assume that responsibility, or to overcome impediments created by Snowflake.

64.    The electronic storage industry was shaken by a series of data breaches in 2023, in record-setting numbers.  The 3,205 data breaches in 2023 represented a 78% increase over the number in 2022.  Defendants knew that major data breach affecting Snowflake would be harmful to the Company and its stockholders.  They also knew that a major deterrent to a

breach was "multi-factor authentication" or "MFA" system (this is a system whereby a person signing on to a system enters a password plus does one or more other things to prove identity, such as entering a code received via text message). However, Snowflake's system architecture set up roadblocks: MFA was turned off by default, and systems administrators could not impose the safety measure (in industry terms could not "enforce" it).

65.     In discussing Snowflake's risks and systems, Snowflake and the individual Defendants created a misimpression that customers were handling access security, when in fact they had not been able to do so.

66.     Snowflake's awareness of its customers' vulnerabilities can be inferred from a drastic shift in how it described its Shared Responsibility Model in early 2024. In its Form 10-K filed on March 26, 2024, at p. 47, Defendants said:

> Our security teams work with management to prioritize our risk management processes and *mitigate cybersecurity threats, including those that may materially impact our business.* Our assessment and management of material risks from cybersecurity threats *is a key risk area within our enterprise risk management program*. Our Chief Information and Data Officer, Chief Information Security Officer, and EVP, Engineering are responsible for management of cybersecurity risk under our enterprise risk management program, and senior management and the audit committee of our board of directors receive reports on the key risks and the effectiveness of our management of such enterprise risks. In addition, key cybersecurity risks are assessed as part of our internal audit program. We have completed various security audits and certifications, including SOC 2 Type II, SOC 1 Type II, PCI-DSS, HITRUST, FedRAMP High, and ISO/IEC 27001. We also employ a shared responsibility model where our customers are responsible for using and configuring our platform in a manner that meets applicable cybersecurity standards. *As part of this shared security model, customers have sole responsibility for creating and securing their access credentials for our platform.*

67.     What Defendants knew, but didn't disclose in that Form 10-K, was that prominent customers had proved unable to manage security for access credentials, and were unable to navigate Snowflake's customer-unfriendly tools which included multi-factor

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

authentication (the gold standard of user protection) ***being turned off by default***, rendering system administrators unable to "enforce" compliance with security measures at the user level. Having addressed this issue, Defendants had a duty to do so frankly, fully, and honestly. Instead, they concealed that they had created a situation in which major users were at high risk of a data breach, a scenario which would also harm Snowflake and its investors.

68.    Best practices in Snowflake's industry are set forth by CISA.  On its website, CISA states: "CISA provides information on cybersecurity best practices to help individuals and organizations implement preventative measures and manage cyber risks." In its 2023 white papers, although CISA did not mention Snowflake by name as its internal practices were not yet known, it did describe practices essentially identical to what Snowflake was doing (or not doing).  Its October 2023 white paper, which contained an overview section captioned "Vulnerable By Design", CISA declared that resting cybersecurity on the shoulders of the customers was "untenable."  Security risk was such a difficult and specialized issue, CISA noted, that even many IT professionals could not adequately comprehend what was required. Thus,  "Applications should be made with clear indicators about the potential risks that may result from [product] settings and should make those indicators known." White Paper, at 13. Many customers were, CISA found, "generally unable to facilitate" what was needed to maintain security—*i.e.,* to "to research, fund, purchase, staff, deploy, and monitor additional security products to reduce the chance of compromise."  *Id.*  The Defendants knew this, but said nothing about it in its discussion of cybersecurity risks.  Indeed, this knowledge motivated the shift in its Form 10-K language so as to set the table for "blaming the customer" when the inevitable wide-scale security breach occurred.

69.    Avoiding best practices also enabled Snowflake to escape the extra time, and expense that implementing and updating proper security measures would have entailed.

70.    On May 23, 2024, Snowflake stock dropped on higher-than-normal volume from $163.34 to 156.16.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

71.   In addition, at this same time, a data breach affecting major Snowflake customers was beginning to become known.  As news came out bit-by-bit, Snowflake's shares dropped.

72.   On May 22, 2024, cybersecurity watchdog Mandiant notified Snowflake and law enforcement of an ongoing hacker campaign focusing on Snowflake customers.  On May 30, 2024, Snowflake reported: "We became aware of potentially unauthorized access to certain customer accounts on May 23, 2024."  In the following days, several major customers confirmed they had been hacked.  Finally, on June 10, 2024, Mandiant reported that as many as 165 companies had been affected, including household names such as Ticketmaster, AT&T, Santander Group, Advance Auto Parts, Lending Tree and Neiman Marcus.

73.   Snowflake scrambled to address the issues and refine its architecture. (In the ensuing multidistrict federal litigation, Snowflake's arguments that it lacked a duty to protect customers against this breach were rejected).

74.   By June 10, 2024, Snowflake stock had fallen to $126.76 on high trading volume, with breach-related disclosures largely responsible for driving the price down as revelations jolted the market little by little, eroding the stock price from its initial value of $154.58 on May 23, 2024.   These price drops represented the materialization of an undisclosed risk that flowed from Snowflake's concealment of the degree of vulnerability and lack of precautions prevailing at major Snowflake customers.   Instead of frankly disclosing customers' severe lack of preparedness when it raised the issue of customer security, Defendants misleadingly downplayed the matter by simply stating the customers were (in its view) solely responsible for access security.  Snowflake did not reveal that major customers were unable to handle that responsibility, or that its system settings impeded implementation of important security measures.  Snowflake has since conceded

22

that, as to security issues, the company and its customers have a "shared destiny."  It has also worked to drastically upgrade security.

75.    One tech security specialist, Dr. Frank Wang,  noted in the wake of the breach that even if Snowflake was not 100% responsible, "compared to other software, Snowflake does have a worse product security experience," which makes it "hard" to implement proper security.  This difficulty resulted in a serious security risk, as Defendants knew customers had not adopted adequate security measures.  Additionally, an article in Cybersecuritydive.com noted: "Snowflake's approach to MFA bears inherent limits for its IT administrators. An instance of Cisco Duo that is managed by Snowflake is the only MFA solution available to its customers, and the company doesn't allow administrators to enforce MFA for a specific role, according to the company's MFA support page."   Ofer Maor, co-founder and CTO at Mitiga, stated that Snowflake was out of step with the industry: "While other vendors may also offer the ability to start without MFA, *most SaaS vendors*, once deployed as an enterprise solution, allow administrators to enforce MFA." (Cybersecuritydive article, June 13, 2024).

76.    The data breach affected at least 165 customers.  These included:

- AT&T – Over *50 billion* call records and other customer data exposed.

- Ticketmaster / Live Nation Entertainment – Unauthorized activity detected in a third-party cloud database environment. Up to *530 million* customers compromised.

- Santander Group – Data from Santander Chile, Spain, Uruguay, and some former employees accessed. Up to *30 million* customer records,   including account balances and transaction histories. .

- Advance Auto Parts – Customer data compromised.

- LendingTree.  Financial and personal data exposed

23

- Neiman Marcus – Customer records stolen involving *70 million* transaction records containing gift card data and customer IP addresses.

- Bausch Health – Health and financial data affected.

77.    In the ensuing federal litigation, the MDL Court ruled: "It can be inferred that this [customer] failure to implement MFA arose from Snowflake's failure to enforce its standards." *In re Snowflake, Inc.,* No. 2:24-MD-03126-BMM, 2025 LX 472160, at *23 (D. Mont. Oct. 29, 2025).    In addition, Snowflake failed "to protect customer data from foreseeable risk of harm by providing additional security measures…" *Id*. at *22.   Given the highly publicized and frequent data breaches during the Class Period, this topic would have been a focus of Defendants, and they would have known of these deficiencies, and did know of them.

78.    In sum, the Defendants knew that "Shared Responsibility" was an abject failure, creating an extreme vulnerability, and a high risk of data breaches.   Yet they discussed the program in either positive or neutral terms designed to set off no alarm bells, and to leave investors in a state of ignorance.   In doing so, they violated the federal securities laws.

## **CLASS ACTION ALLEGATIONS**

79.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Snowflake common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, and directors and officers of Snowflake and their families and affiliates.

80.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of 2024, Snowflake had over 300 million shares of common stock outstanding, owned by hundreds or thousands of investors.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

81.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants' statements and/or actions misrepresented material facts;

(c) Whether Defendants' statements and/or actions omitted material necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements, actions, and/or omissions were false and misleading;

(e) Whether Defendants' misconduct impacted the price of Snowflake common stock;

(f) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) The extent of damages sustained by Class members and the appropriate measure of damages.

82.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

83.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

84.     A Class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRESUMPTION OF RELIANCE

85.     At all relevant times, the market for Snowflake common stock was an efficient market for, among other things, the following reasons:

25

(a) Snowflake common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b) As a regulated issuer, Snowflake filed periodic public reports with the SEC and the NYSE;

(c) Snowflake regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services; and

(d) Snowflake was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s) and which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

86. As a result of the foregoing, the market for Snowflake common stock promptly digested current information regarding Snowflake from publicly available sources and reflected such information in the price of Snowflake common stock. Under these circumstances, all purchasers of Snowflake common stock during the Class Period suffered similar injury through their purchase of Snowflake common stock at artificially inflated prices and the presumption of reliance under the fraud-on-the-market doctrine applies.

87. Further, at all relevant times, Plaintiff and other Class members relied on Defendants to disclose material information as required by law. Plaintiff and other Class members would not have purchased or otherwise acquired Snowflake common stock at artificially inflated prices if Defendants had disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

material facts concerning the Company and its business, Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

88.     Neither the federal statutory safe harbor applicable to forward-looking statements under certain circumstances nor the bespeaks caution doctrine applies to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. The statutory safe harbor or bespeaks caution doctrine do not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the Company's current and historical financial accounting practices, financial condition, and internal controls, among other topics.

89.     To the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward looking statements" when made, and/or were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by the Company were insufficient to insulate Defendants from liability for their materially false and misleading statements.

## LOSS CAUSATION

90.     During the Class Period, as detailed herein, Snowflake and the Individual Defendants made false and misleading statements and omissions, and engaged in a scheme to deceive the market. These false and misleading statements and omissions artificially

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

inflated the price of Snowflake common stock and operated as a fraud or deceit on the Class (as defined above). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, Snowflake's common stock price fell significantly. As a result of their purchases of Snowflake common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## ADDITIONAL SCIENTER ALLEGATIONS

91.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the documents and public statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Snowflake, and their control over and/or receipt and/or modification of Snowflake's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

92.    Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complexity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

93.    The Individual Defendants, because of their positions with Snowflake, controlled the contents of Snowflake's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability

28

and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants are responsible for the accuracy of Snowflake's corporate statements and is, therefore responsible and liable for the representations contained therein.

94.     Defendant Slootman had unusual motives and the opportunity to commit securities fraud, as he had concealed his retirement plans and had set up a Rule 10b5-1 plan designed to sell hundreds of millions of dollars of stock in a very short period before adverse facts were disclosed.

## CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### For violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5

### (Against All Defendants)

95.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

29

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases and trades of Snowflake securities during the Class Period.

98.    The Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

99.    The Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

100.    As a result of the foregoing, the market price of Snowflake securities was artificially inflated or otherwise adversely affected during the Class Period. In ignorance of the falsity of the Individual Defendants' statements, Plaintiff and the other members of

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the Class relied on the statements described above and/or the integrity of the market price of Snowflake securities during the Class Period in purchasing Snowflake stock.

101.    Had Plaintiff and the other members of the Class been aware that the market price of Snowflake securities had been artificially and falsely inflated and adversely affected by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased Snowflake securities at the artificially inflated prices that they did, or at all, and would have taken measures to avoid their losses.

102.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial. By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases and trades of Snowflake securities during the Class Period.

103.    This claim was brought within two years from when it reasonably could have been discovered and within five years from when the violations alleged herein occurred.

## COUNT II
### For violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

104.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

105.    During the Class Period, the Individual Defendants participated in the operation and management of the Company and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

106.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

107.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which were disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Snowflake securities.

108.   Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

109.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations alleged herein.

110.   This claim was brought within two years from when it reasonably could have been discovered and five years from when the violations alleged herein occurred.

///

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

A. Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B. Awarding Plaintiff and members of the Class damages with interest;

C. Awarding Plaintiff reasonable costs, including attorneys' fees; and

D. Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 22, 2026                                  Respectfully submitted,

/s/ *David N. Lake*
David N. Lake
**LAW OFFICES OF DAVID N. LAKE, A PROFESSIONAL CORPORATION**
16130 Ventura Boulevard, Suite 650
Encino, California 91436
Tel: (818) 788-5100
Fax: (818) 479-9990
Email: david@lakelawpc.com

**OF COUNSEL:**

Laurence D. Paskowitz
**THE PASKOWITZ LAW FIRM P.C.**
97-45 Queens Boulevard, Ste. 1202
Rego Park, NY 11374
Tel: (212) 685-0969
Email: lpaskowitz@pasklaw.com

Beth A. Keller
**LAW OFFICES OF BETH A. KELLER, P.C.**
118 N. Bedford Rd., Ste. 100
Mount Kisco, NY 10549
Tel: (914) 752-3040
Email: bkeller@keller-lawfirm.com

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## CERTIFICATION OF PLAINTIFF

I, Samantha Smith, do declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft of the Complaint herein (the "Complaint") and has authorized the filing of a Complaint substantially similar to the one reviewed.

2.  Plaintiff did not purchase the security that is the subject of the Complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff sets forth in the attached chart all of her transactions in the security that is the subject of the Complaint during the Class Period specified in the complaint, May 24, 2023 through June 10, 2024.

5.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered, or as otherwise approved by the Court.

    I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.


Signed this _____ day of May, 2026.
        05 / 15 / 2026

_____
                Samantha Smith

Doc ID: 859befa48810ba69d8d350b77b440a7de993535d

| Company Name/Ticker | Transaction (Buy or Sale) | Trade Date | Price | Quantity |
|---|---|---|---|---|
| SNOW | Buy | 3-28-24 | 162.71 | 5 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Doc ID: 859befa48810ba69d8d350b77b440a7de993535d